(No. 13996.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRÊQUETTE PURSLEY, Plaintiff in Error.

*Opinion filed February 22, 1922.*

1. CRIMINAL LAW—*indictment for murder need not give technical description of wound inflicted.* An indictment for murder need not give a particular or technical description of the wound inflicted, where such description will furnish no valuable information as to the nature of the offense or the evidence required to prove or disprove it and will be of no benefit to the defendant in the preparation or presentation of his defense.

2. SAME—*when court should admit entire statement offered to impeach testimony of witness.* In a trial for murder, where a part of a signed statement of a witness' testimony at the coroner's inquest is offered to impeach the witness the entire statement should be admitted in evidence, where it is short and is confined directly to the words and acts of the parties at the time of the homicide which are the subject of the witness' testimony on the trial.

3. SAME—*in a murder trial the jury may be instructed in regard to implied malice.* In a murder trial the fact that external circumstances may exist capable of proof showing express malice, such as the declarations of the accused or his lying in wait for the deceased, does not prevent the proof of other circumstances from which malice may be implied, and as the existence of malice is a question for the jury to determine, it is proper to advise the jury as to the circumstances under which malice may be implied.

4. SAME—*when homicide committed during a quarrel is manslaughter and not murder.* One who provokes a quarrel and is the

aggressor in a fist fight is engaged in an unlawful act but not one likely to result in death, and if he has no intention of killing his opponent and the latter unexpectedly attacks him with a deadly weapon, the act of the aggressor in resisting such an attack with a knife, causing the death of his opponent, is manslaughter and not murder; but a mere attempt by his opponent to strike with his fist does not justify the use of a deadly weapon by the aggressor nor reduce the offense to manslaughter.

5. SAME—*when jury should find defendant guilty of manslaughter.* Where one person attacks another without justifiable cause and without malice, express or implied, and without any mixture of deliberation whatever, and by the use of a deadly weapon kills him, the killing amounts only to manslaughter; and if the proof on the part of the prosecution leaves a reasonable doubt in the minds of the jury as to whether the killing is murder or manslaughter, the defendant is entitled to the benefit of the doubt and can be convicted only of the lesser crime.

6. SAME—*when jury should be instructed as to facts necessary to conviction for manslaughter.* Where the defendant's version of the homicide with which he is charged tends to show that the crime was manslaughter and not murder he is entitled to have his version of the occurrence submitted to the jury under proper instructions, and it is error to give an instruction stating facts under which the jury should find the defendant guilty of murder and to refuse an instruction stating facts under which he may be found guilty of manslaughter.

7. SAME—*when jury may disregard testimony of witness—instruction.* While the jury may entirely disregard the uncorroborated testimony of a witness who they believe has knowingly sworn falsely to any material fact, they cannot disregard such of his testimony as is corroborated by other credible evidence, but it is essential that the corroborative evidence be credible, and it is error for the court to strike out the word "credible" from an instruction stating the rule.

8. SAME—*when the jury cannot disregard testimony of a witness.* The jury cannot entirely disregard the testimony of a witness merely because there is impeaching evidence of his statements made out of court at variance with statements on the witness stand, but the jury may be instructed to take such fact into consideration in determining the weight to be given the evidence of such witness.

FARMER and THOMPSON, JJ., dissenting.

WRIT OF ERROR to the City Court of DuQuoin; the Hon. BENJAMIN W. POPE, Judge, presiding.

L. A. CRANSTON, and R. A. PIERCE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JUDSON E. HARRISS, State's Attorney, ALBERT D. RODENBERG, and EDWARD C. FITCH, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error, Frequette Pursley, was convicted in the city court of DuQuoin of murder and was sentenced to death. He has sued out a writ of error to review the record.

The homicide occurred on December 8, 1920, in the shop of the Blakeslee Manufacturing Company, in the city of DuQuoin. The plaintiff in error is a negro, twenty years old. He had been working for the Blakeslee Manufacturing Company about two months. He was the only colored man among the fifteen or twenty employees of the company. Eugene Watson, the deceased, was a machinist, twenty-two years old, who had been in the employ of the company for seven years. There were several rooms in the company's plant. North of the machine shop was a room known as the erecting room, and north of that another room in which was a blacksmith shop. Toward the west end of the north wall of this room, which was an outside wall, was a door. About eleven o'clock in the morning the plaintiff in error was working near the southwest corner of this room grinding castings on an emery wheel. Watson came into the room from the machine shop with a set-screw which he had been directed to temper at the forge, which was on the north side of the room, a little east of the door in the north wall. In tempering the screw there was need of more light and Watson opened the north door. It was a cold, raw morning and there was a north wind. The plaintiff in error told Watson it was too cold and asked him to shut the door. The plaintiff in error then went to the door and closed it. Watson opened it again, and he

and the plaintiff in error exchanged some words. The plaintiff in error picked up a casting from the floor and drew it back, but threw it down and went out of the shop. He went to the machine shop,—the south room,—where he saw Arthur Spencer, the foreman, and complained to him about Watson opening the door. Spencer told the plaintiff in error that he would put him to work in another place and directed him to pile some switch-points on a platform east of the hydraulic press, which was in the middle room or erecting room. This platform was about twenty feet east of the passageway from the north room to the south room. The plaintiff in error went to work piling the switch-points, and a few minutes afterward, when Watson, having finished tempering the set-screw, was going along the passageway to the machine shop,—the south room,—the plaintiff in error called him. Watson turned around the south end of the hydraulic press and walked to where the plaintiff in error was standing on a slightly raised platform. There were several other employees in the room, but they were engaged at their work, the machinery was in operation, making a great deal of noise, and there are only two witnesses whose testimony was material as to what occurred at this time.

Reginald Spencer, the seventeen-year-old son of the foreman, an apprentice, was working at a drill on the west side of the passage from the machine shop to the north room and a little south of the hydraulic press. He testified that Watson stood in front of the plaintiff in error with his hands down at his sides. The plaintiff in error talked loud to him, making motions with his left hand close to Watson's face. He said to Watson, "Quit fooling with me," and made other remarks which Spencer could not understand. Watson did nothing, but said, "I won't let any colored fellow run over me," and turned as if going away. The plaintiff in error slapped him on the cheek with his left hand. Watson dropped the cold chisel, two-foot rule

3ᴦ2—5

and scale which he was carrying in his right hand and the set-screw which was in his left hand and struck at the plaintiff in error with his open right hand and then with his left fist. The plaintiff in error had been standing, before this, with his right arm at his side and his hand down at full length behind his right hip. Spencer could not see at first what the plaintiff in error held in his right hand, as his right side was close to the hydraulic press. The plaintiff in error raised his right hand high over his head, holding a knife, with the bottom end of the handle between his thumb and forefingers, a blade about three and one-half inches long sticking out from the bottom of his hand. He stabbed downward three or four times quickly, holding the knife like a dagger. Watson jumped back after the first blow of the knife, and the plaintiff in error advanced and continued striking with the knife. Watson was backing away with his hands and arms held up in front of his face, shielding himself from the blows. When he struck the first blow the plaintiff in error was standing on the platform, and when he struck the last one he was about eight feet southeast of the platform, on the ground. Watson trembled and turned white and ran to the south room.

John Schmitt, who had worked for the Blakeslee Manufacturing Company for two or three years, was at work at a drill press south of Reginald Spencer's press and first saw Watson and the plaintiff in error standing by the hydraulic press, quarreling, Watson with his hands at his side and the plaintiff in error with his left hand up, making motions. Schmitt did not see plaintiff in error's right hand and did not see anything in Watson's hand. Later he saw both strike, the plaintiff in error using only his left hand and holding his right hand down at his side until he began striking with a large knife in that hand. He struck three or four times. Watson moved away and the plaintiff in error advanced toward him and struck at his head and shoulders, Watson guarding with his arm.

Watson went out to the south room, and it was found that he had received a wound under the left arm about one inch wide and three inches deep, which penetrated about the center of the left arm-pit in an upward direction at an angle of about forty-five degrees, toward and into the body. It severed the large axillary artery and three branch arteries. He died as the result of the wound about 3:30 that afternoon. There were two other wounds, one on the left side of the neck toward the front,—a slight cut about three inches long, a little lower in front than at the side,—and one on the scalp above the left ear, an inch or two in length.

Pursley testified that when Watson came into the north room where Pursley was at work and opened the north door, Pursley asked him to close it and let it stay closed until he got the fire made. Watson made no reply and Pursley walked over and closed the door. As he turned to go back to his work Watson came to the door and opened it, and Pursley closed it again. Watson pushed it open and the door hit Pursley on the right side or elbow. Then Watson kicked him two or three times. Pursley's glasses fell off and he stooped over to pick them up by a pile of castings, each weighing about three or four pounds, and as he picked up the glasses with his left hand he at the same time picked up a casting with his right hand and drew it to keep Watson from bothering him as he passed by him. Pursley then went to the south room, where he saw Spencer, the foreman, and complained that Watson had opened the door and jumped on him and kicked him, and said that he did not want to go back down there because he was afraid if Watson bothered him there would be trouble. Spencer said he would give him a little job to do until Watson left there. Pursley worked a little while, when Watson came from the north room past where he was at work. Pursley called him and Watson walked over close to Pursley. Pursley said,

"Gene, I have always treated you nice, haven't I?—and now you have not treated me right; but that is all right; we will go on and be the same, but I won't have any more to do with you and I want you to not have anything more to do with me; we will call it square; now, I want you to do that." About that time Watson struck Pursley with his fist and used some nasty words. Pursley put up his left hand to defend his face and struck a blow with his right. There were several blows by Watson before Pursley struck him. Watson hit Pursley twice,—once on the ear and once on the lip,—and Pursley managed to hit Watson one blow with his right hand, which knocked Watson about six or seven feet from him. When Watson recovered he slapped his hand on his cold chisel in his right pocket, and Pursley seeing this got his knife from his pocket. The knife was old and easy to open. He pulled it open and had not got it opened well before Watson was close up to him again, and to keep Watson off Pursley stuck the knife out toward him. Whether it struck him or not Pursley did not know, but he made two or three thrusts right quick, and was stabbing at him all the time to keep him from hitting Pursley with the cold chisel. Pursley said he did not intend to hurt him but was trying to bluff him with the knife to keep him from striking him with his cold chisel. The last time Watson struck at Pursley with the cold chisel Pursley threw up his left arm. Watson's hand hit Pursley's arm and the chisel dropped from Watson's hand to the floor. Watson then struck at Pursley hard with his left fist and at once turned and walked away. Pursley took the knife out of his pocket because of Watson's action. Where he stood there were two pairs of motor wheels on one side of him and a stack of switch-points on the other, so that he was in a corner, hemmed in, had nothing to get his hands on and could not get out and run away. He pulled the knife, not with the intention to do what he did but to keep Watson from hurting him.

A motion was made to quash the indictment for the reason that it did not with certainty apprise the defendant of the nature of the charge against him and did not charge or describe the place on the body where the wound was inflicted. The indictment contained four counts, and the charge, which was substantially the same in each, was that the defendant made an assault upon Watson, and with a deadly weapon, to-wit, a knife, which he held in his hand, in and upon the body of the said Watson did then and there strike, cut, stab, thrust, penetrate and wound, thereby then and there giving to the said Watson one mortal wound, of which the said Watson languished a short time, and then and there, on the eighth day of December, 1920, died. In indictments for murder, particularity in describing the wound whereby death was occasioned was in earlier times regarded as essential, but modern statutes have done away with the necessity for a minute description where it is not requisite to an understanding of the case. The Criminal Code provides that every indictment shall be deemed sufficiently technical and correct which states the offense so plainly that the nature of the offense may be easily understood by the jury. A technical description of the character of the wound inflicted would have furnished no information of any value as to the nature of the offense or the evidence required to prove or disprove it and would have been of no benefit to the plaintiff in error in the preparation or presentation of his defense. The motion to quash was properly overruled.

It will be seen from the statement which has been made that the evidence for the People, if accepted by the jury, was sufficient to sustain the verdict. It is insisted, however, that prejudicial error occurred on the trial. Reginald Spencer testified at the coroner's inquest, which was held on the day of the homicide. His testimony was reduced to writing and he signed it. The plaintiff in error having called his attention, on cross-examination, to this

statement, offered it in evidence to impeach his testimony. The court admitted a part of the testimony before the coroner which he indicated, stating that it was the only part contradicting the testimony of the witness, and refused to admit the rest. The statement, both the part which was admitted and the part which was refused, differed in some details from the testimony of the witness on the trial. Whether the discrepancies were such as should affect the credit of the witness was a question of fact which should have been left for the jury. Where a long statement of immaterial matters is made it may not be necessary to admit the whole document for the purpose of impeaching the credibility of a witness, but in this case the testimony of the witness before the coroner was short, was confined directly to the words and acts of the parties at the time of the occurrence which was the subject matter of the investigation and of the testimony of the witness at the trial, and the whole statement should have been admitted, though perhaps the discrepancies between it and the testimony of the witness on the trial are not of so material a character as would alone require a reversal of the judgment for the error in rejecting the part of the statement which was excluded.

It is contended that the only evidence of malice was that tending to show express malice, and the court having instructed the jury in regard to implied malice, the complaint is made that such instructions were upon an abstract principle of law, and were irrelevant. Express malice is defined by the statute as that deliberate intention unlawfully to take away the life of a fellow-creature which is manifested by external circumstances capable of proof. The statute also provides that malice shall be implied when no considerable provocation appears or when all the circumstances of the killing show an abandoned and malignant heart. The fact that external circumstances may exist capable of proof showing express malice, such as the declarations of the accused or his lying in wait for the deceased,

does not prevent the proof of other circumstances from which malice may be implied. The existence of malice is a question of fact in every case of homicide for the jury to determine, and it was therefore proper to advise the jury as to the circumstances under which malice may be implied.

According to the testimony of the plaintiff in error, when Watson came from the north room past where the plaintiff in error was at work the plaintiff in error called him over to talk the matter over with him, and said that Watson had not treated him right, but that was all right, and they would go on and be the same but would not have anything more to do with each other and would call it square, and about that time Watson struck Pursley with his fist and used some nasty words towards him and hit him twice. There were several blows before Pursley struck Watson, and then he hit Watson a blow with his right hand which knocked him six or seven feet. When Watson stopped going back he slapped his hand on his cold chisel in his right hand pocket, and it was then that Pursley drew out and opened his knife. He did not intend to hurt Watson but made two or three thrusts at him to keep him from hitting Pursley with the cold chisel. If this statement had been accepted by the jury and they had believed that Pursley was apparently in imminent danger of losing his life or suffering great bodily harm the defense of self-defense might have been sustained, for the statement showed Watson as the aggressor throughout; but if the jury believed that Pursley was the aggressor in a fight with fists, that he had no intention of killing Watson but that Watson used the cold chisel to attack Pursley and Pursley only used his knife to protect himself against this attack, then a verdict of guilty of manslaughter would have been justified. The court, however, by the instructions withdrew the question of manslaughter from the consideration of the jury and also all question in regard to the alleged attack of Wat-

son on Pursley with the cold chisel. The court gave the following instruction:

"The court instructs the jury that if you believe from all the evidence in this case beyond a reasonable doubt that shortly before the killing of the deceased, Eugene Thurston Watson, by the defendant, Frequette Pursley, in manner and form as charged in the indictment, if such is shown by the evidence beyond all reasonable doubt, that the deceased and the defendant had had a quarrel and if you further believe that the quarrel between the two had ended and that a short time thereafter the defendant, Frequette Pursley with the intention of renewing the quarrel or provoking another difficulty, called to him, the deceased, Eugene Thurston Watson, and that the defendant thereby and at that time did renew the former quarrel or provoke a new quarrel by his conduct and words and as a result of said quarrel the defendant, Frequette Pursley, feloniously, willfully, and with malice aforethought killed the deceased, Eugene Thurston Watson in manner and form as charged in the indictment and not in necessary or apparently necessary reasonable self-defense, then such killing would be murder and you may so find by your verdict notwithstanding the fact that during the difficulty and before the mortal blow was struck by the defendant the deceased Eugene Thurston Watson had attempted to strike the defendant with his fist."

The request of the plaintiff in error for the following instruction was refused:

"The court instructs the jury that even if you find from the evidence in this case that defendant, Frequette Pursley, voluntarily got into a difficulty or fight with Eugene Watson but did not intend to kill at the time and did not decline further fighting before the mortal blow was struck by him, and then drew a knife and with it struck and killed Eugene Watson you will find the defendant, Frequette Pursley, guilty of manslaughter, although the cutting and killing were done in order to prevent an assault upon him by

Eugene Watson or to prevent Eugene Watson from getting the advantage in the fight."

The instruction which was given entirely disregarded the defendant's evidence in regard to the attack upon him by Watson with the cold chisel and that his use of the knife was only to protect himself from such assault. If the defendant provoked a quarrel and was the aggressor in a fist fight he was engaged in an unlawful act but not one likely to result in death, and if he had no intention of killing the deceased but the latter unexpectedly attacked him with a deadly weapon, the act of the defendant in resisting such attack with his knife which caused the death of the deceased would not be murder but manslaughter. The object and effect of the last clause of the instruction was to eliminate from the consideration of the jury, in determining the question of malice aforethought, the defendant's evidence in regard to the alleged assault upon him with the cold chisel. The instruction given is based upon the hypothesis that the plaintiff in error feloniously, willfully and of malice aforethought killed the deceased, not in necessary or apparently necessary reasonable self-defense, but the last clause is misleading in that it purports to state the facts which the defendant claimed to justify or extenuate his action and did not state them correctly. A mere attempt of the deceased to strike the defendant with his fist would not justify the latter in meeting the assault with a deadly weapon or reduce the grade of the homicide to manslaughter. The instruction, by completely ignoring defendant's version of the occurrence and directing a verdict of murder even though the deceased had attempted to strike the defendant with his fist, without referring to the other material facts testified to by the defendant, necessarily led the jury to believe that such other facts as the defendant had testified to were not worthy of consideration and their verdict should be arrived at without considering them. No instruction was given with reference to the state of facts testified to by the defendant

if the jury should find such state of facts proved, and no instruction was given in regard to the circumstances under which the defendant could be found guilty of manslaughter. In *Adams* v. *People,* 47 Ill. 376, an instruction given at the request of the People was held to be correct, as follows: "If the defendant sought a difficulty with the deceased for the purpose of killing him, and in the fight did kill him in pursuance of his malicious intention of taking the life of Bostic, they will find him guilty of murder; but if they find that defendant voluntarily got into the difficulty or fight with Bostic but did not intend to kill at the time and did not decline further fighting before the mortal blow was struck by him and then drew his knife and with it struck and killed Bostic, they will find the defendant guilty of manslaughter although the cutting and killing were done in order to prevent an assault upon him by Bostic or to prevent Bostic from getting the advantage in the fight." The testimony of the defendant, if accepted by the jury, came within the latter part of this instruction, and the defendant had the right to have the jury instructed as to his rights under his version of the occurrence. So in *Kinney* v. *People,* 108 Ill. 519, it was held that if a defendant, without previous malice against the deceased and with no intention to take his life, sought for and provoked a personal difficulty with him which resulted in an assault being made by the deceased with a deadly weapon contrary to the expectation of the defendant, who in return shot the deceased, from which death ensued, the homicide, while it could not be justified upon the ground of self-defense, would amount to manslaughter. Where one person attacks another without justifiable cause and without malice, express or implied, and without any mixture of deliberation whatever, and by the use of a deadly weapon kills him, the killing amounts only to manslaughter, and if the proof on the part of the prosecution leaves a reasonable doubt in the minds of the jury as to whether the killing is murder or manslaughter he

is entitled to the benefit of that doubt and can only be convicted of the lesser crime. (*Smith* v. *People,* 142 Ill. 117.) It was erroneous for the court to give the one instruction and refuse the other.

In instructing as to the form of the verdict the court gave the jury the form for finding the defendant guilty of manslaughter, but no instruction was given as to the facts under which, if shown by the evidence, the defendant should be found guilty of manslaughter. The facts were to be decided by the jury, and the defendant had the right to have his version of the occurrence submitted to the jury for their determination under proper instructions as to the rules of law applicable to the facts, if the jury should find them to be in accordance with the defendant's evidence.

The plaintiff in error requested the court to give the following instruction:

"The court instructs the jury that you are the sole judges of the facts in this case and of the credit to be given to the respective witnesses who have testified; and in passing upon the credibility of such witnesses you have a right to take into consideration their prejudices or motives or feelings of revenge, if any such have been proven or shown by the evidence in this case; and if the jury believe from the evidence that any witness or witnesses have knowingly or willfully testified falsely as to any material fact or point in this case the jury are at liberty, *unless corroborated by other credible evidence, to disregard the entire testimony of such witness or witnesses.*"

The court refused the instruction as asked and modified it by substituting for the words in Italics the following: "to disregard the entire testimony of such witness or witnesses, except so far as it is corroborated by other evidence or circumstances in the case," and gave the instruction as modified. The instruction as asked stated the well known rule which has been stated in many cases, that while the jury may entirely disregard the uncorroborated testimony of a

witness who has knowingly sworn falsely to any material fact, they have no right to disregard his testimony so far as it is corroborated by other credible evidence but in such case must consider it in connection with the other evidence in the case. (*Chicago and Alton Railroad Co.* v. *Kelly,* 210 Ill. 449; *Bevelot* v. *Lestrade,* 153 id. 625; *City of Sandwich* v. *Dolan,* 141 id. 430; *Johnson* v. *Farrell,* 215 id. 542; *City of Chicago* v. *Lederer,* 274 id. 584.) The modification struck out the word "credible," thus ignoring the requirement that the corroborating evidence should be credible. The instruction should have been given as requested.

Instruction 12 which was given for the People is subject to the same objection.

The plaintiff in error asked the court to give the following instruction:

"The court instructs the jury that one method of impeaching a witness is by showing that he has made statements out of court at variance with statements on the witness stand, and if the jury believe from the evidence that any witness in this case has made statements at any other time or place at variance with his evidence in this case, *you will be justified in disregarding his entire testimony except so far as he has been corroborated by other credible evidence or by facts and circumstances proved on the trial.*"

The court modified it by striking out the part in Italics and inserted in lieu thereof the following: "you have the right to take such fact into consideration in determining the weight to be given to the evidence of such witness." The instruction as offered was not correct and might have been refused, but as modified it stated a correct rule of law. *Beedle* v. *People,* 204 Ill. 197.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*

FARMER and THOMPSON, JJ., dissenting.